& Co., Ltd. v. Jurong Shipyard Pte. & Co., Ltd. v. Mr. Thalgaier Good morning, Your Honors, and may it please the Court. Eldridge faces a dilemma in this case that we've identified, along with other issues, and that dilemma is if the accused device infringes, as the jury found, it's because a Y-duct is a housing, and if a Y-duct is a housing, the co-conprior reference invalidates the patent. Let me begin, though, and focus in on housing just a little more, and the construction of housing by the trial court. The trial court found that a broader than either party that proposed, and broader than a standard dictionary definition even of the term, that is a case of enclosure for a machine part. Why haven't you waived any ability to make the more logical argument you're trying to make here than the one you made below by, because you requested from the district court a construction that had about 14 limitations built into it. Two reasons, Your Honor. First of all, as I understand it from studying the law, the sort of price of admission to discussing the court's claim construction with Your Honors is not that we were right in all respects. And I'm not suggesting we weren't right, but as the case has evolved, it's become clearer that there is a simple claim construction that is at least as right, and that would suffice. That's not the price of admission. The question is whether the district court was right or wrong, and we suggest they were wrong, any more than they get to say that the district court was right when the district court used a different claim construction than they proposed. The second thing is this is not a case where that issue was at claim construction and just stopped. It was at issue throughout the whole case, and in fact, in response to a motion of limited they made before the trial, we indicated to the court that at very least we thought the there was a housing for something mechanical. And you can find our argument in that regard that we made to the trial court at 813-717, and that issue continued throughout the case. Also, it continued when our expert's testimony in that regard, the jury was totally disregarded when he tried to explain why, oh, why that doesn't happen. So from the district court's perspective, this claim construction thing has to be a moving target. You propose one, and the court says, no, I don't agree with you, and then later you can say, well, how about if we go back and maybe think of a different one? Your Honor, it can be a moving target. It was a moving target for us when we first had a claim construction, and they made a motion to eliminate. At one point we said, Your Honor, can we at least say that it has to be a case or enclosure for something mechanical? And the judge said, no. He said, well, can we say it has to be a case or enclosure for something? We said, yes, when our expert tried to explain it, he wasn't allowed to explain it. So I agree that claim construction is a moving target, but it was a moving target for everyone in this regard, Your Honor. This isn't a case like Broadcom versus Qualcomm, where the first time anyone said a claim had to be construed was after the trial. This was an issue that was with us through the trial. If one does look at that construction, the main point I want to make about that, we have made about that, is in the brief summary of the invention, there are two and only two aspects of the invention in there, and they both limit the invention to either an engine exhaust system comprising a housing adapted to surround a terminal portion of the exhaust pipe, or utilizing a housing to form an annual region. That's it. They suggest in their brief that because there was a, what I'll call a boilerplate statement, that you are not entitled to read the alternative preferred embodiments into the claims, that their invention shouldn't be so limited. They do not seek to limit the summary of, quote, the invention. And the law we've studied, Your Honor, indicates that, as in Verizon and Honeywell, when someone says, this is the invention. I guess one of the concerns I have with your argument is that the housing, as disclosed in the patent, is essentially this tubular structure, right? And the Q device also has something that is argued over, is the housing is also a tubular structure. And your arguments are really more about the specification of the patent describing certain structural positioning and arrangements and locations of that tubular structure vis-a-vis the exhaust pipe. And the claim recites the particular structural relationship between the claimed housing and the claimed exhaust pipe. And yes, it's not exactly the same structural relationship and relative location that's described in the preferred embodiment of the spec, but it feels like you're asking us to read into the noun housing particular structural relationships and relative locations between that noun and a different noun, the exhaust pipe. Your Honor, I respectfully don't think we're doing that. What we have in this, and you can see it if you look at the accused device, which you'll find in our opening brief on page 12, are simply two exhaust pipes coming together. One exhaust pipe is ported into another. There is no housing in that sense. Whereas, if you look at every figure of the patent and their description of the invention, they say there's a housing adapted to surround an exhaust pipe in their brief summary. So essentially what's happened is the housing is gone and the pipe that brings in the ambient air, the pressurized air, is simply connected directly to the exhaust pipe. What about the fact that there are actual statements in the written description that talk about the housing being adjacent to the end of the exhaust pipe. How could that be if it has to surround it? Your Honor, it talks later in the written description about the exhaust pipe having an extension and the extension of the exhaust pipe sleeve, 12, can be considered one and the same. So if the exhaust pipe and the sleeve are considered one and the same, which they can be according to column 4, line 24, then every embodiment in this description makes sense for the exhaust pipe being surrounded. And again, it's described... Where are you in column 4? Line 17? No, Your Honor. Column 4, line 24. The exhaust pipe may replace the sleeve 12 and or the exhaust pipe may be considered the sleeve 12. Isn't the sleeve the exhaust pipe? That's the point. If you look, for example, in figure 1, the exhaust pipe sort of stops before, in this case, the sleeve 12 and 12's extension of the exhaust pipe. And their point is, consider that the exhaust pipe to be right. Now, let me move on. Well, one other thing, and I really touched on it, no matter what the court's claim to obstruction is, and I've mentioned this to Judge Chen a little bit, but there simply is not a housing here. There are two exhaust pipes coming together. You have to remove the housing, really, and put the exhaust pipes together to come up with the... Right. I guess the jury concluded that with the accused product, there's, again, I'll just call it a tubular element that is connected to the end of... It believed that the exhaust pipe was cut off at an earlier point in time and that there was an additional tubular element connected to the end of the exhaust pipe to which the air pipe was connected into. Right? And whether... I don't know what they concluded. They did conclude that there was... Well, let's assume that's what they concluded for infringement purposes. That there was... There was testimony to that effect, was there not? There was testimony by Mr. Davis that somewhere where the two pipes came together, there was a housing. I don't recall precisely what he said, and I don't think it was precise. Which probably brings me to the next issue, which is this. Assuming, if you'd like, as the jury seemed to have found, that a Y duct is, in fact, a housing, you come to the next problem, because you come to the Kopin reference. And Kopin has the same arrangement. You can see that by comparing figure four on page 10 of our reply brief to the accused device, also on page 10. The Kopin device anticipates it, claim one, because it has all the same elements. If, in fact, a Y duct is considered a housing. Although in Kopin, the exhaust pipe is this continuous pipe that goes all the way across, and the ambient air pipe is entering a portion of the exhaust pipe. Well, that's... I don't see, I guess what I'm trying to say, I don't see a separate third element in Kopin. What I see is the pipe for the ambient air, and I see an exhaust pipe. I don't see a separate element that we could call a housing. Well, and that, respectfully, Your Honor, if it's not in Kopin, it doesn't appear to be in the accused device. Well, I guess there was testimony that for the accused device, there was some third element that bolted on to the end of the exhaust pipe, in which the ambient air pipe enters into. Well, I guess if the idea is that you had a separate piece that is exactly the same as the exhaust pipe, which the patent already says you extend the exhaust pipe, that was the testimony, but that is hopefully not what they relied on for an invention, that we extended the exhaust pipe by bolting something on. That's not the testimony that I remember. So, what we see is that there's the same arrangement in Eisen and Kopin, and I ask Your Honors to review that. In fact, one of the other things they say is that Kopin doesn't show something coupled, when in fact, Kopin does exactly say that the second pipe is coupled to the output end of the first pipe at a cute angle. So, Kopin does teach that. The other thing that they rely on, and mostly to distinguish the two, Kopin, that is, as prior art, and the accused device, is that there is no teaching of V2 greater than V1, that is, that the combined velocity is greater than the exhaust pipe velocity alone. But respectfully, we've cited the testimony of Dr. Beeman, which is unrebutted in that regard. The Venturi effect from... That testimony was kind of hard to follow, though, because it appears that there must have been  but that is not included as part of the record, and so we can't tell what it was he was talking about. He explained a conservation of mass result, Your Honor, which, incidentally, is the same sort of logic that the patent office and the appellate division of the patent office found, and finding these claims actually invalid. Over another reference, finding that Eldridge had admitted that the combination of pressurized air and exhaust to a fixed area inherently reduces a faster flow velocity. Actually, the claims that are now asserted stand rejected on appeal by the patent office, using a very similar principle, saying that when you have two fluid flows coming together in one pipe, you do have an increased velocity. I'd like to use the rest of my time to... Yes, we agree. Good idea. Let's hear from Mr. Johnson. Thank you, Your Honor. Could we get a status report on the re-exam? The claims have been remanded to the examiner. They're being considered now and hearing arguments. When you say remanded, they stand currently rejected, right? A first office action rejecting the claims was issued, and that was... Excuse me. The claims were affirmed. The board heard an appeal from that. The board entered a new ground of rejection, rejecting all of the claims, right? Yes, and sent it back to the examiner. On multiple grounds, right? I believe only one ground, Your Honor, but it was sent back to the examiner to consider new evidence and hear argument on whether that was a proper rejection. And if the ground was having to do with the velocity of the gas, is that right? It did have to do with the velocity of the gas. It involves a different reference, a Nakagami patent, that included an airplane propeller that was flying and driving the gas through the system. And so it was a different configuration, and a higher velocity was potentially achieved in that reference through that airplane propeller. But all the claims require is that the outgoing velocity be greater than the incoming velocity, correct? Not by any proportion. It just has to be a greater outlet velocity. That is correct. Okay. And there was testimony from Dr. Beeman that, in fact, that was necessarily inherent as a matter of physics, correct? That was his contention. He admitted it was not expressly disclosed and contended that it was necessarily there. However, in order to reach that conclusion, he had to look at the drawings in Copeland that were not to scale, that included no dimensions, and a specification that included no dimensions. And he then compared with his, quote, eyeball look to compare the size of those pipes to then determine that there would be a greater outlet velocity. That's improper to this Court's precedent in the Nystrom case and the Hall-Pockerson-Halberstadt case, that you cannot look at not-to-scale drawings without dimensions, compare those relative sizes to arrive at a conclusion achieving invalidity. In addition to that, the jury rejected his argument that it was necessarily present, finding that his basis was not supported. But I also want to move up to plane construction. Show me exactly where you believe in the written description anything other than a housing that surrounds the exhaust pipe is disclosed. I believe Your Honor has addressed it during Mr. Allgaier's portion when we talked about the sleeve. The sleeve, it does say, can be the exhaust pipe or extend from the exhaust pipe, but it also says the sleeve may be used, making the sleeve optional. Therefore, you could have a configuration that the exhaust pipe terminates at the housing and there is no extension sleeve that goes into the housing. That would be one embodiment that would meet that. What do you mean no extension sleeve that goes into the housing? So is there any housing at all in that circumstance? Yes, the housing is still the section of pipe where the gases combine and mix before they are ejected away from the structure. That's exactly how the specification describes the housing. It's where the pressurized fresh air and the exhaust gases are combined within the housing and then are ejected away from the roof. Okay, so does the housing have to have a separate piece from the exhaust pipe? Not necessarily. It could be the way the pipe is constructed. It could have exhaust pipe and then the housing component where the streams come together. Okay, so you're saying that the housing component could be one and the same as the exhaust pipe. It could be. And that's the section of Column 4 that we were talking about before? I believe it is there and I believe it's also in Column 3, Netlines 55 to 57. It talks about the sleeve being a potential embodiment. What about the abstract which says the housing is adapted to reside adjacent to terminal portion of an exhaust pipe so that the pressurized air injected into the housing entrains the exhaust gases and disperses them from the housing? That is described as one aspect of the invention? Is it not described as the invention as a whole or that the invention includes that? I'm asking this question, I think, in a way that might help you. The housing is adapted to reside adjacent to the terminal portion of an exhaust pipe. So maybe this sentence is suggesting that the housing doesn't have to envelop the exhaust pipe or any section of the exhaust pipe. It really has to reside adjacent to the terminal portion. I would agree. Okay. I apologize, I thought you were asking. You thought I was trying to drill you. No, I thought you were addressing Mr. Allgaier's attempt to say that the specification expressly limits the claim to the preferred embodiment to a disclosed embodiment. And I was addressing that point to say that the specification uses permissive language throughout. If it uses permissive language throughout, and so therefore we're supposed to find that the claim is not limiting, where does the claim teach anything else? I don't understand what you mean by anything else. Anything other than an outer housing that envelops either a sleeve or an exhaust pipe. It teaches it that if it had a sleeve, it's optional. It teaches it, as Judge Chen mentioned, that the housing could be adjacent to the exhaust pipe. And the purpose of the housing is to allow the combination of the gases. That's how it's described in the specification, and that's how it's used in the asserted claims as well. The asserted claims require that the gases are combined within the housing and then are jetted away from the structure. Let's move to your loss-profit theory. Certainly, Your Honor. I'm having a hard time with the concept that sales that occur prior to the issuance of a patent would constitute sales that could have been captured but for the infringement when the infringement necessarily can't occur until after a patent issue. I would address that with two points, Your Honor. First, I think appellants have mischaracterized the sale. The date they're pointing to is the date Jerome requested bids, but two of the rigs were actually delivered after the patent issued. The Atwood Condor was about a year and a half after the patent issued, and the West Capron was two years after the patent issued. Further, the second point would be that the infringement, the damages for infringement are from the infringement, which has occurred since the patent issued for all of them. For those first two, Jerome's inducement would be what happened when it delivered those rigs after the patent issued, and for the third one, it's its continuing providing of indemnity to CEDRIL to allow it to continue using the infringing system. Under the Hewlett-Packard case, this court held that you can infer intent to cause inducement, intent to cause infringement through an indemnification if that removes a threat of the patent litigation, and that's what we have here. In fact, we don't even have to infer it. CEDRIL testified that it was relying on Jerome's indemnity. That indemnity clause was part of the purchase agreement between CEDRIL and Jerome, right? That is correct. And that purchase agreement was entered into well before the patent issued. That is correct. And it was kind of a generic indemnification clause, right? I wouldn't say… It didn't say, if this company over here ever gets a patent, then I want to make sure that you indemnify me, Jerome, for any possible infringement action down the road. It wasn't like that. It didn't identify Eldridge as its indemnification. That is correct. But it did say it was specific as to patent infringement and was specific to sales use of the rig. Right, but there was lots of testimony that these are very standard clauses in these types of construction contracts in this industry. Right, but what we're looking for, Your Honor, is conduct by Jerome after the patent issued that encouraged infringement. And what we have is Jerome telling CEDRIL, we will indemnify you. Go ahead and keep using it. Based on an indemnification clause that was entered into years before the patent issued. That is correct. All right, so what if we don't agree with you that that is the kind of indemnification agreement that would support a finding of inducement? What are you left with with respect to that rig? We'd also have that Jerome's other conduct would be when it went to Twin City Fan and said, hey, you need to indemnify us so that it could continue selling these systems and using these systems. But that's with respect to other systems, not the one that was delivered before the patent. No, that's all systems, Your Honor. And that's a misstatement in Appellant's reply brief, I wanted to point out. They claimed in their reply brief that Jerome is not an indemnitor and that there is no evidence in the record that Jerome was an indemnitor. How would Jerome's communications with its parent company, Twin City, be regarded as Jerome actively inducing CEDRIL to commit infringement? I guess that's where I'm lost. You would think that proof of inducement would be Jerome somehow inducing CEDRIL to do something, not Jerome talking to its parent company. It wasn't talking to its parent company. It was talking to the provider of the systems. Oh, I'm sorry. Well, Twin City and Azen. Correct. That's who they were talking to. They weren't trying to get, at that point in time, CEDRIL to behave in a specific way. But it was actions by Jerome showing that they wanted to continue to sell the systems, continue to have their customers use them in an infringing way when they knew they were infringing. So that would be an additional point I would direct the court to. Is there any case that you're aware of where a patent owner was able to get lost profits from a user of an infringing device? Yes. As I understand the lost profits case law, they were all in the context of a patent owner seeking lost profits damages from a direct competitor, a seller of the accused product, not the ultimate customer and user of the accused product. Yes, Your Honor. So the MNCO combustion engineering case involved use. There was a kiln that was patented, and the patented kiln was used to create products, and they got a lost products award on those products, the non-patented products that were sold. So that was a non-sale in which lost profits were awarded. Was it a direct competitor that the patent owner was suing in that instance? Yes, Your Honor. But that wasn't lost profits as it relates to the sale of the patented item. That's correct. It was lost profits as to the non-patented products that were created using the patent system. By a competitor. Correct. So that's different. Judge Chen just asked you if you had any cases where they weren't competitors. Yes, but he also asked about sales, and so I was addressing the sales portion. But as far as the non-competitors, in the Shockley case, this court explained that joint users and makers and sellers are all joint tort users against whom the recovery can be had against any of them. So that would suggest that you aren't limited to just your competitor. You can have it against the user of the system as well. How about when the sale happens before the patent is granted? Where a purchaser, I think that fits our fact pattern here. The purchaser buys a product, legitimately at that point in time, and then possesses the product. And then at some point down the road, the patent pops up. And now that product, which prior to that time was not infringing, is now infringing. Is there a case that's ever said that in that particular instance, that long-standing use that is now infringing, the user now needs to pay lost profit damages to the patent owner? I'm not familiar with the case that either says you can or cannot have lost profits in that scenario, Your Honor. Another case I would direct the court to is the Glen Eyre case that said the damages are the same for direct and indirect infringement. So in that situation, you just alluded to, you could have the indirect infringement of the provider of the system and then the user of the system that it is infringing, even though there's no sale, even though the user is not a direct competitor, and you could have the lost profits be the same against it. You asked the trial court for an injunction to prohibit the continued use of the rig with the infringing device, correct? We did, Your Honor. I can add to those three rigs that the trial court refused to grant the injunction, correct? That is correct, Your Honor. So you don't have an order from the trial court ordering that those new, perfectly functional rigs be retrofitted, correct? That is correct. So if we are not entitled to our lost profits on systems but for the infringement, we would have provided, because the contracts required Eldridge NGET or equivalent systems, the rigs had to have systems like this included on them. Jarong admitted that it could not have sold the rigs without these systems, and the but for the infringement, we would have made that sale. There's no other competitor in the marketplace. But I'm talking about where the sale occurred before the patent ever issued. Well, it depends on where you're talking about. So how do you have but for causation in that circumstance? I mean, your argument is that, well, we would have gone in and retrofitted it, but they weren't required to retrofit. But for the infringement, they would have been required. The reason the court didn't go to the injunction is because it found we'd been made whole through the lost profits. When you have a circumstance in which somebody is using a product and that use all of a sudden becomes infringing, there are lots of ways that that can be remedied. One is you can request the court to order that they not use the product at all. You can request the court to order that the product be modified, or you can ask for a royalty for continued use of that product. None of those were remedies that you were awarded, correct? That's correct. We were awarded our lost profits, but for the infringement, when those systems came into the United States, they should have had our system on them. They could have been retrofitted with our systems. When they came into the United States, the patent hadn't been issued. For two of the reasons, it had been. Right, but for one of them, it hadn't. So how could it, but for the patent, it have to have been on there if the patent hadn't been issued yet? The but for it is the infringement. When they are using it, it's an infringing use, and if they are not permitted to do that infringing use, then they had to have our system on there. There was no other alternative. The contracts required the system. They said that they had to have the system on there. I mean, that's the answer, is that the infringement is the inquiry, not the sale. So the infringement occurred after the patent issue, and but for that infringement, the rigs would have had our system on it, be it retrofit or through the original construction after the patent issue. Are there no further questions? This case is just about roughly $600,000 or some odd dollars. It is for the lost profits on those three rigs, which I believe is slightly more than that, but I think you were in the ballpark, Your Honor. And the injunction. And the injunction on additional rigs, because there were about a dozen or so rigs that included these systems, some of which had not come into the United States, and so the injunction precludes those from coming in and being infringed when they enter the United States. Okay. Thank you, Mr. Johnson. Mr. Allgaier, you have a couple of minutes. Thank you, Your Honors. What I just heard counsel say is that housing could be a section of the pipe, and I don't see how you square that with the notion that when you have separate elements recited in your patent, you can say, well, actually, we don't need that element. We can just extend the pipe. Particularly, and I don't mean to beat this to death, but in their summary of invention, and the reason people write summaries of invention, near as I know, is to say to the examiner, and therefore the public, look, here's why I should get a patent. This is a little narrower than you might think, but here are the main aspects of my invention, and that included the housing that was surrounding the exhaust pipe. It says that, and that is not disclaimed. That's not just a performance argument. In terms of indemnity, I'll make one other point about indemnity. Under the Uniform Commercial Code, there's an implied warranty of non-infringement, which means in every commercial transaction, unless it's disclaimed, there are going to be damages in the form of indemnity if somebody is found to infringe. I don't think you can read from that some intent to induce infringement any more than you can read some intent to induce infringement from a boilerplate contract that a very powerful shipyard can put in place to suggest that they get indemnified. The law just doesn't go that far. One other thing. Gerard being in the case is in the case under only an inducement theory. Everything they did was in Singapore. That is a specific intent crime or specific intent offense. You would have to find or someone would have to find and they would have to prove to the jury that these in Tehran would have known how housing would have been interpreted, that a wide deck would become a housing, that these devices were going to the outer continental shelf even assuming that it is true that the patent laws search that far or apply that far. There simply is no evidence of any specific intent like that that Gerard would have had specific intent to infringe. Therefore, Gerard can't be liable at all. That's the end of the issue for Gerard. We're left with, at most, trying to figure out what a reasonable royalty is in this case which has never been done because the jury did not find that. If there are any further questions, I would... Thank you. Thank you. The case is taken under submission. That concludes the argued cases for this morning. All rise.